## Case No. 16,211.

### UNITED STATES v. RYCRAFT.

[Milwaukee Daily News, Scr. Bk. 178.] [3]

District Court, D. Wisconsin.

FUGITIVE SLAVE LAW—AIDING IN ESCAPE.

[1. On a prosecution for aiding in the escape of one arrested under lawful process as being

---

[1] [Reported by A. J. Dallas, Esq.]

[2] [Reported by Hon. William Cranch, Chief Judge.]

[3] [Published from a scrap book in the clerk's office at Philadelphia. Date not given.]

a fugitive slave, it is not necessary to show that he actually was the slave of the person at whose instance the process was issued.]

[2. The fact that the members of a vigilance committee formed to prevent the execution of the fugitive slave law stated that their object was to prevent the "kidnapping" of the fugitive by the officers of justice and the alleged owner, furnished strong evidence of their responsibility for a subsequent riot and rescue of the fugitive from the jail in which he was confined, even though they individually counseled peaceable measures.]

This was an indictment against John Rycraft for aiding, assisting, and abetting in the escape of Joshua Glover, a fugitive slave.

MILLER, District Judge (charging jury). At the commencement of this trial, I remarked, that verbal application had been made, on behalf of a reporter for a daily paper, for leave to report the evidence in this case. After the case is concluded, I have no objections that a correct report be made. I have never consented in any case, that a report be published during the pendency of a trial. The jurors have access to the papers, and feeling an interest in the proceedings, may there read what may not be correct. Jurors should find a verdict upon the evidence as it passed to them from the witnesses, without having their minds disturbed by reading the reports of irresponsible and perhaps inaccurate reporters. In criminal cases, so far as my observation has extended, I am inclined to think, injustice has been done in several instances, by the daily publication of evidence, during the trial. And in case of non-agreement of the jury, a just second trial is rendered uncertain by such publications. For these reasons I respectfully request the editors, to postpone any publication of the evidence, until the cause is finally determined. I do not make a positive command, but a respectful request, which in every instance heretofore has been complied with. This request I believe has been complied with, and you are left to decide this case upon the evidence, as you understood it, from the witnesses.

I also, at an early hour of this trial, cautioned you against outdoor influences, feeling it my duty to protect the purity of the jury-box. In all cases likely to be attended with excitement, I have pursued this course, and gave the jurors to understand that an attempt to influence their decisions, out of court, is indictable, and that it is their duty to make the information. The law throws around a juror, sworn to try an issue according to evidence, a circle, into which no man can corruptly enter with impunity. One object of the provision, in the federal constitution, of a judiciary, was that a tribunal may exist in each state, wherein all persons may appear as suitors, unembarrassed by local prejudices, influences, or interests. This is a court of the nation, open to all persons of every state or country. Residents of our sister states of this Union appear here under the constitutional provision, as American citizens, on an equality with those of Wisconsin; and inhabitants of, or emigrants from foreign states, as suitors, have equal consideration with our own citizens. This being a national court, you are a national jury, equally removed, with the judge, from all local influences. A gentleman occupying the seat of a juror in this court, will feel it a duty, in promoting this object of the constitution, to discard from his mind all local prejudices, or feelings in regard to policy, circumstances, or individuals.

The subject of slavery in the several states of the Union, has been attended with difficulties, both before and since the adoption of the federal constitution. Through the cupidity and avarice of England, slavery was introduced into the American colonies; and it existed in them without regard to their locality, North or South, until the people in the North found by experience that it was unprofitable. At the adoption of the constitution, it existed in all the states; but laws had then been generally enacted in the Northern states for its gradual abolition. At the adoption of the constitution of the United States, slavery had been so engrafted into the several states, that a constitutional provision for the surrender of fugitives from labor, became essential to the adoption of that instrument. The constitutional provision upon the subject is this: "No person held to service or labor in one state, under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up on claim of the party to whom such service or labor may be due." What I shall say to you upon this occasion has nothing new or original with me. I shall content myself by following decisions of the supreme court of the United States, and the opinion of the supreme judges, Story and Curtis, of Massachusetts, Baldwin of Pennsylvania, and Nelson of New York.

The mode of delivering up fugitives from justice and labor, is not prescribed in the constitution, nor by any law, until the act of congress, respecting fugitives from justice and persons escaping from the service of their masters, of February 12, 1793 [1 Stat. 302], four years after the adoption of the constitution. This act being found defective and inoperative, the amendment of Sept. 18, 1850 [9 Stat. 462], was passed. In respect to this amended act: In a charge of the circuit court of the United States, in the state of New York; to a grand jury, Mr. Justice Nelson, of the supreme court of the United States, remarks: "It will, I think, excite some surprise, after the determined opposition to the passage of the supplementary act, and even threatened, and in some instances, actual resistance to its execution in certain quarters, when it is seen that there is not a power conferred upon those appointed to administer it judicially, but what was conferred upon the judges and other state magistrates under the act of 1793 —a law approved by Washington and Adams, and enacted by the fathers and founders of

the republic—not one. It is simply, in this respect, a substitution of the commissioners for the state magistrates, who were disabled and prevented from discharging their duties by the state authorities. Full confidence was reposed in them by the general government, so long as they were permitted to act. When thus disabled, other officers were selected, of necessity, to supply their places. This is the only difference, as it regards the judicial authority conferred by the act. Neither is there any power conferred by it, on the claimant, his attorney, or agent, but what is found in the act of 1793—not one. All the additional powers are conferred upon the ministerial officers; the marshal and deputy marshal, who are required to execute the warrants and other process issued in pursuance of its provisions, and which warrants and process are the same as those provided for in the previous act, and none others. Every ground of opposition to this recent act, distinguishable from opposition to the former, is exclusively referable to the powers with which the marshal and his deputies are armed, with a view to its execution." The supreme courts of the several states in the North have sustained this law. And the supreme court of the United States in repeated decisions have sustained it, and we, both judge and jury, are bound by these decisions.

It is said, that this law is unjust, as it allows a master to arrest his fugitive slave, and to bring him before a judge or commissioner for examination. The right of a master to arrest his fugitive slave, is not a solitary one in the laws of this country. A master may pursue and apprehend his fugitive apprentice, whose service and labor he is entitled to demand by virtue of the deed of indenture. A father may compel his errant minor child to return to parental protection, and to submit to parental authority. A surety may pursue and carry back his absconding principal, and commit him to prison in discharge of his recognizance. All these things are done daily without producing excitement, and not one of these persons, except apprentices, can claim, by virtue of any statute provision, an open, fair and public examination upon disinterested testimony before their removal is effected, as in the case of fugitive slaves.—The fugitive from justice may be arrested upon a warrant founded upon an affidavit of the injured or interested party, and removed without a preliminary hearing; and it frequently results upon trial that the charge is unfounded. While the law under consideration is effective in carrying out the provisions of the constitution, it is equally so in protecting free colored persons from secret or criminal deportation.

The marshal is held to the United States for the use of all persons interested, with sureties, in a bond of a heavy penalty for the faithful discharge of his official duties. He is liable in this bond for all acts of his deputies. He is required to execute every process committed to his hands, either by himself or a deputy. This process was handed to Deputy Marshal Cotton, but was directed in the usual way to the marshal. If Glover owed service to Garland in the state of Missouri, and escaped from there, and was apprehended by Cotton upon this process, and was rescued by the crowd that surrounded the jail, the marshal and his sureties are liable to Garland for the full value of the fugitive, in the state of Missouri. The marshal had the alternative, either to receive the warrant, or pay Garland one thousand dollars penalty; and now since the fugitive has escaped, he has no way known to the law, to avoid paying his full value. Such is the law in all cases. The marshal is bound under a penalty to receive all process issued to him, and to endeavor to serve them. If he arrests a man upon a capias, and a rescue is effected, he must pay the plaintiff his damages. If he makes an arrest upon a ca. sa., he is liable to the plaintiff for the full debt, in case of a rescue. If he levies upon personal property under a fi. fa., he is liable to the plaintiff for the value thereof, or for the debt, if it should be taken from his custody even by superior force.

For these reasons, and also to maintain the majesty of the laws, it is the duty of all good, law-abiding citizens to aid this officer, upon all proper occasions, in the service of process. And if the court and jury should refuse him legal redress for the resistance of process, his duty to himself and his sureties will compel him to resort to forcible means; which (in Russell on Crimes, page 666,) may be used even to the taking of life: "Amongst the acts done, by the permission of the law, for the advancement of public justice, may be reckoned those of the officer, who, in the execution of his office, either in a civil or criminal case, kills a person who assaults and resists him. The resistance will justify the officer in proceeding to the last extremity. So that in all cases, whether civil or criminal, where persons having authority to arrest or imprison, and using the proper means for that purpose, are resisted in so doing, they may repel force with force, and need not give back; and if the party making resistance is unavoidably killed in the struggle, this homicide is justifiable. A rule founded in reason and public utility, for few men would quietly submit to an arrest, if in any case of resistance the party empowered to arrest were obliged to desist and leave the business undone." I was pleased to see that the legislature of this state, at its last session, passed a law for the punishment of resistance to state process, similar to the act of congress; and it is no doubt the anxious desire and prayer of every good citizen that these laws may be faithfully administered; and the dreadful alternative of force be avoided. The officers, by whose agency the government of the United States administers the domestic affairs of the country, have a just claim upon the government for protection from assaults or interruption, in the discharge of their several duties and the judi-

ciary, which is a component part of the government, is bound to render them that protection. Attacks upon officers of government, so as to render its laws and authority ineffective, is the first step towards insurrection, and their defence is the protection of the stability and integrity of the government. In all this matter, we have not arrayed ourselves against our fellow-citizens. Having done just what the law required of us, we have a right to expect that confidence and protection which are due to us as citizens, and that respect due a judicial tribunal. In this free country, liberty of action is allowed, while not in opposition to the force or authority of government, and not prejudicial to the peace or happiness of society, or the rights of individuals; but in the discharge of official duties, officers must pursue the course marked out by the law, without regard to personal consequences or considerations.

This court and jury have nothing to do with the opinions of men, disconnected with the case; nor have we anything to do with the opinions of the defendant. We are not here to be controlled by the opinions of men upon any subject. It is not our business to inquire into the opinions of this defendant, or of any man in this community, upon the subject of slavery, or any other subject; nor to compare our opinions with theirs; nor to gratify our own opinions; but to administer the laws of the land with fidelity. The defendant is not upon trial for his opinions, but for his acts. He may believe that a particular law should not be administered, and that the process issued in pursuance of it should be resisted; but if his opinions, ceasing to be speculative, have ended in acts; no morbid sympathy, no false respect for pretended "rights of conscience," or "superior law," can prevent this court and jury from judging him justly, without fear or favor. The constitution and laws of the United States are the supreme laws of the land; and no "higher law" in opposition thereto, can be recognized in a court of justice. If a man willfully violates the laws of his country by the commission of an offence known to those laws, he comes with a poor grace before a jury of honest men, sworn to render a true verdict according to evidence, with the plea of "higher law" or "rights of conscience." In this respect the case is not different from any other known to the catalogue of crimes.

The proposition. that the law, under which this indictment is framed, is distasteful in this community, and should not be enforced, cannot be tolerated in a court of justice. Courts do not make the laws; but to administer them in their purity, is their limited and responsible duty. All constitutional laws are the expression of the sovereign will of the people through their representatives. Every man is represented at the enactment of all laws of congress; and even if any laws there enacted are not according to our peculiar opinions or interests, we are bound,

as good citizens to obey them, and as judge and jurors to administer them, while they remain upon the statute book. Upon no other principal can this government exist as a government of written constitutions and laws. If an appeal to courts and juries to disregard acts of congress, because they may be distasteful or unpopular, or because their representative was in the minority, or for any other reason, were allowed, every public act would be annulled in portions of the United States. The law-making power, vested in congress by the constitution, would soon became nugatory, through the imbecility or corruption of courts and juries. To ask the judge to withhold the prescribed sentence, or the jury to find a verdict in disregard of the evidence, because they or the community looked upon a law with disfavor, is asking a commission of moral perjury. Such a corrupt principle can not be advanced without a rebuke commensurate to its enormity.

This court administers laws, that I might not vote for as a representative; and decides causes, in pursuance of decisions of the supreme court of the United States, which individually I might not approve. The organization of our government, and of our judicial system requires this surrender of private opinion, on the part of the judge. Equally so is the duty imperative upon the juror. The jury are called to try the issue of fact submitted by the parties. This they are sworn to try according to evidence. Under the judicial system of the United States, they take the law from the court in all cases both civil and criminal, whether it comports with their individual opinions or not. U. S. v. Battiste [Case No. 14,545]: U. S. v. Morris [Id. 15,815]. The court pronounces the law upon its responsibility; and the jurors find the facts upon their responsibility; and both for judge and jury the law and evidence alone form the rule of action, to which men of sound heads and honest hearts will conscientiously adhere, while judicial tribunals are esteemed courts of justice. The act of congress uses the words, as nearly as may be to those in the constitution in the description of the person. It makes all persons indictable, who may aid, abet or assist the person apprehended, to escape from the claimant, or from the person assisting the claimant, either with or without process. This warrant was issued at the instance of Garland, the claimant, whereby he procured the assistance of the marshal, or a deputy. The marshal's deputy, Cotton, in this instance, was a person assisting Garland the claimant, with a process. The terms "fugitive," "person owing service or labor," are descriptive of the person apprehended, as the words "slave" or "apprentice," would be if used.

The first count charges that the defendant did aid. abet, and assist Joshua Glover, a person owing service and labor to Benami S. Gar-

land in the state of Missouri, from where he fled, to escape. The plea I think puts this whole charge in issue; and as there is no evidence in support of it, what I shall address to you will relate to the second and third counts of the indictment. These counts set forth the warrant, and the arrest by Cotton, the deputy marshal, of the person described in the warrant, and that the defendant did aid, abet and assist in the escape. According to the decision of the circuit court of the United States for the Southern district of New York, in the case of U. S. v. Reed [Id. 16,134], and the intimation of the circuit court for the Massachusetts district in U. S. v. Morris [supra], these two counts do not involve the question of the slavery of Glover. The only questions raised by these two counts, are these. Was the warrant issued and served as therein stated, and did the defendant aid, abet or assist in the escape? Glover escaped before the hearing required by the law. Whether he was a slave or not, and had fled from Missouri, had not been determined by the proper officer; nor is it to be upon this issue. If Garland should prosecute the marshal, or the rescuers, for the value of Glover, he would then be bound to prove satisfactorily, by disinterested testimony, in the way prescribed by our rules of practice, that Glover owed him service according to the laws of Missouri, and that he escaped from such state. This is a prosecution for the public offence of resisting a lawful process. "An escape is a violent or privy evasion out of some lawful restraint; as where a man is arrested or imprisoned and gets away before he was delivered by due course of law." The judge has lawful authority to issue this process; and the process is strictly according to law. It was lawfully served by the deputy marshal; Glover was thereby in the custody of the law, from which he escaped before he was delivered. He was in custody, the same as if he had been arrested upon a capias, or any other warrant. Garland might have arrested Glover under the law without process, and brought him before the judge for examination, but he procured this warrant, which the marshal was bound to receive and serve. Glover was lodged in jail by the deputy marshal, and was there placed by him under keepers. From the moment of his arrest by Cotton until he escaped, he was in the possession of Cotton as deputy marshal. He was lodged in jail for safe keeping. The marshal may, before a trial or hearing, lodge a man arrested in jail, or in his own house, or any place else, but he is legally held for the return of his prisoner with his process. It would be absurd to advance any other idea as to the officer's liability, than that he is bound to serve process placed in his hands, to make an arrest and to bring the prisoner arrested before the authority issuing the process. And it is equally absurd to hold that the marshal should not be protected in the execution of his process. The officer must be protected, if the law of the land is to prevail; and any person concerned in the endeavor to obstruct his process, or take the person arrested out of his custody or hands becomes a public offender, and liable to the punishment the law annexes to the offence. The escape in this case is just as complete as if it had been effected from the hands of the marshal; and those who aided in it are equally as guilty as if they had rescued Glover from the manual possession of the marshal.

The indictment charges that the defendant did aid, abet and assist Glover to escape from the custody of the deputy marshal. If the defendant did either aid, or assist, or abet in this escape, he is guilty. The words "to aid," "to assist," mean the same thing; that is, to help another in the commission of some act; to abet, is not only to render help, but to encourage or promote the commission of an act. The mere presence of the defendant when the act was committed, without participation on his part, does not make him accountable. Exciting, directing, consenting to, or encouraging the escape complained of, is abetting it; and if the defendant did either of these acts, he is guilty, whether he applied the axe or battering-ram or not. If the defendant took part in this matter, by inciting, or directing it, or consenting to it, or encouraging it, with others, it is not necessary to prove the particular act of each. Each one is liable for the acts of the others. The law fastens the consequence of any illegal act upon him, which he may have in any manner, as before mentioned, done, brought about, or caused.

It is proven by witnesses on the part of the prosecution, that the defendant was present at the jail, working and assisting to break the door of the jail-yard and the door of the jail. It is also proven by witnesses on his part, that they did not see him commit these overt acts. In such a case the affirmative testimony must prevail. Those who did not see defendant commit these acts, do not contradict those who did see him. Those witnesses who saw the defendant at the tree no doubt speak truly, and still may possibly not contradict those of the prosecution. In such a crowd, excited as that appears to have been, they may possibly be mistaken as to the exact moment of time. It is the duty of the jury to reconcile evidence of witnesses without imputing perjury or false swearing to any, if possible. If witnesses contradict each other, and they are equally credible, the jury should give the affirmative testimony the preference. If a witness was connected with the defendant, his testimony is not entitled to the same weight as that of a disinterested witness. The jury will judge of the evidence for themselves.

These are all the rules of evidence that I now deem necessary for your instruction in regard to the testimony of the witnesses generally. But there is one item of evidence which my duty requires me to notice. Herbert Reed was called by the defendant, and,

among other things, he testified that a committee of vigilance was organized on that morning, of which he and the defendant were members. He stated, in substance, some of the acts of that committee; and that one of its objects was, that the kidnappers should not take Glover out of town before a trial; that the kidnappers were Cotton, the owner, and any others who took part. He said that he heard said that Glover should not be taken away. He also said that the defendant suggested to call upon the judge, and assure him, if he would then order the prisoner up for hearing, that he would not be allowed to escape. That the defendant was for peaceable measures. He further stated that the committee did not offer to assist the marshal. Another witness—Stratton, I think—stated that he went to the back door of the jail, as he heard in the crowd that the kidnappers were taking Glover out there. Now, if this testimony is so as stated, it presents one of the worst features in the case. The crime of kidnapping, or feloniously carrying off a free person into slavery, is one of the most heinous in the law; and the epithet of kidnapper is one of the most odious that can be applied to an individual. If this committee organized, in whole or in part, to control the action or the time of the action of the judge, or for treating the officers of the law and of the court as kidnappers, they are responsible for this rebellion. This was the best means that could be adopted to influence the minds of the people, and to cause this riot and escape. The appellation of kidnappers applied to those men, under the circumstances, was to bring that jail down.

If I had ordered the marshal to bring up Glover for hearing, at that time, it certainly could not have been done. Under the cry of kidnapper the rescue would have been effected by that excited crowd, and the personal safety of the officer periled. An offer to the judge of protection would be of little avail, after a mob was got up by the cry of rescue, and inflamed by that of kidnapper. If, as from the defendant's evidence, he was associated with that committee which was engaged in impeding or obstructing the process, he must take the consequences. They are all indictable. This committee was probably the primary cause of that outrage, and if so, each member of it is responsible for the escape, whether he suggested peaceable means or not. The law is "that, if a man does an unlawful act, that is likely to cause an injury, and an injury is actually caused, it is immaterial by what intermediate hand it is inflicted; the first wrongdoer is as directly answerable as the immediate trespasser—as where a man threw a lighted squib into a crowd, it was thrown by one and another, till it struck a person, and put out his eye, the man who first threw the squib was made answerable." The organization and conduct of that committee were more dangerous than the squib, because more likely to be attended with fatal

consequences, as no cry or epithet would be more exciting in the most orderly community, than that of rescue and kidnapper. The officers of the law are responsible to the law for their acts, and no committee, or set of men can organize to control their acts, or interfere with the service of process, without incurring the responsibilities of the law. This warrant was in the hands of the officer, and no man can throw obstacles in the way of the officer in making full service by apprehending and delivering the person therein named to the authority who issued it.

Verdict, "Guilty."